1

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Plaintiff Yevgeniy S.*
*Androshchuk and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| YEVGENIY S. ANDROSHCHUK, Individually and on Behalf All Others Similarly Situated,<br><br>    Plaintiff,<br><br> v.<br><br>TIKTOK INC. (f/k/a MUSICAL.LY, INC.), and BYTEDANCE INC.,<br><br>    Defendants. | Case No. 2:23-cv-00108<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE AND EQUITABLE RELIEF FOR:**<br><br>1. **FEDERAL WIRETAP ACT (18 U.S.C. §§ 2510)**<br>2. **WASHINGTON WIRETAPPING STATUTE (WASH. REV. CODE § 9.73.030)**<br>3. **INVASION OF PRIVACY**<br>4. **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE ACTION ...................................................................... 1

II.  THE PARTIES ........................................................................................... 2

    A.   Plaintiff.............................................................................................. 2

    B.   Defendants ........................................................................................ 2

III. JURISDICTION AND VENUE ................................................................ 3

    A.   Allegations Supporting Jurisdiction and Venue ........................... 3

IV.  GENERAL FACTUAL ALLEGATIONS................................................ 3

    A.   TikTok's Business Model: Profits from Advertising by Monetizing User Data .................................................................. 5

    B.   Global Privacy Concerns Regarding TikTok's Data Use Practices ........ 6

        1.   Concerns in the U.S. ............................................................... 6

        2.   Concerns Abroad ................................................................... 10

        3.   Biometric Data Privacy Litigation...................................... 11

    C.   TikTok's Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third-Party Websites ..................... 11

    D.   The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiff and Class Members..................................... 17

    E.   Plaintiff and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser ............. 18

    F.   Plaintiff and Class Members Did Not Consent to the Collection of Data via TikTok's In-App Browser...................................... 20

V.   TOLLING.................................................................................................. 21

VI.  CLASS ACTION ALLEGATIONS ....................................................... 21

VII. CLAIMS FOR RELIEF .......................................................................... 24

FIRST CLAIM FOR RELIEF VIOLATION OF THE FEDERAL WIRETAP ACT 18 U.S.C. §§ 2510, *et seq*.
(On behalf of the Nationwide Class and the Washington Sub-Class) ........................ 24

i

SECOND CLAIM FOR RELIEF VIOLATION OF THE WASHINGTON
WIRETAPPING STATUTE Wash. Rev. Code § 9.73.030, *et seq*.
(On behalf of the Washington Sub-Class)..................................................................26

THIRD CLAIM FOR RELIEF  Violation of Common Law Invasion of
Privacy—Intrusion Upon Seclusion
(On behalf of the Nationwide Class and the Washington Sub-Class) ......................28

FOURTH CLAIM FOR RELIEF Unjust Enrichment
(On behalf of the Nationwide Class and the Washington Sub-Class) ......................31

VIII.   PRAYER FOR RELIEF........................................................................32

IX.     DEMAND FOR JURY TRIAL.............................................................33

For his complaint against Defendants, Plaintiff, individually and on behalf of all others similarly situated, alleges as follows:

## I.      NATURE OF THE ACTION

1.      Plaintiff brings this proposed class action on behalf of all persons who downloaded TikTok, a social media application ("TikTok app"),[1] and used TikTok's in-app website browser ("in-app browser").

2.      This case exemplifies that the "world's most valuable resource is no longer oil, but data."[2] Unbeknownst to Plaintiff and Class Members, Defendants TikTok Inc., ByteDance Inc. (together, the "Defendants") invaded their privacy by secretly intercepting information about Plaintiff and Class Members without their consent.

3.      At no time did Defendants disclose to Plaintiff and Class Members that TikTok users who click a link inside the application[3] to access an external website, make purchases, register to vote, or seek to access any information external to the application itself, automatically launch an in-app browser which records all of the data that they input and the actions they take, even though the user appears to have exited the TikTok app.

4.      As described more fully below, the in-app browser inserts JavaScript code into the websites visited by TikTok users. The clear purpose of the JavaScript code inserted into these websites is to track every detail about TikTok users' website activity.

5.      Through its in-app browser, TikTok has secretly amassed massive amounts of highly invasive information about its users by tracking their activities on third-party websites. Defendants have unlawfully intercepted private and personally identifiable data and content from unwitting TikTok users to generate massive

---

[1] And also referred to as "the app."

[2] *The World's Most Valuable Resource Is No Longer Oil, But Data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[3] At times, referred to as "third-party website."

revenues by selling and providing access to this data. Through their clandestine tracking activities, Defendants have violated wiretap laws, unlawfully intruded upon users' privacy, violated their rights of privacy, and unjustly profited from these unlawful activities.

6.     Plaintiff's class action seeks to recover all available remedies, including statutory penalties, and to redress the wrongs imposed by Defendants on Plaintiff and Class Members.

## II.     THE PARTIES

### A.     Plaintiff

7.     Plaintiff Yevgeniy S. Androshchuk ("Plaintiff") is a citizen and resident of the State of Washington. Plaintiff downloaded the TikTok app and created his TikTok account on his mobile device. While using the TikTok app, Plaintiff clicked on links to external, third-party websites. Plaintiff made at least one purchase after viewing advertisements in the app that directed Plaintiff to the merchant's website. Defendants surreptitiously collected data associated with Plaintiff's use of third-party websites without his knowledge or consent.

### B.     Defendants

8.     TikTok Inc. f/k/a Musical.ly, Inc. ("TikTok Inc.") has at all relevant times been a California corporation doing business throughout the United States, with its principal place of business in Culver City, California. Defendant TikTok Inc. is a wholly owned subsidiary of TikTok, LLC.

9.     ByteDance Inc. ("ByteDance Inc.") is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Upon information and belief, ByteDance Inc. operates in concert with TikTok Inc. to carry out instructions relating to the TikTok app. For example, based on the LinkedIn profiles of ByteDance Inc. employees, these employees recruit applicants to work with them on research and development of software for the TikTok

app. Additionally, the "ByteDance" website displays job postings that specifically relate to the TikTok app.

### III.    JURISDICTION AND VENUE

#### A.    Allegations Supporting Jurisdiction and Venue

10.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States—the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*.

11.    This Court also has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are over 100 members of the proposed Classes, members of the proposed Classes are citizens of states in the United States, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.    This Court has general jurisdiction over Defendants ByteDance Inc. and TikTok Inc. because they have their principal place of business in California.

13.    This Court has specific jurisdiction over Defendants because they (i) transact business in California; (ii) they have substantial aggregate contacts California; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of injuring persons in California; and (iv) purposely availed themselves of the laws of California.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to these claims occurred in this District.

### IV.    GENERAL FACTUAL ALLEGATIONS

16.    TikTok has gained immense popularity in the U.S. over the last few years as a social media platform where users create, share, and view short videos. In the U.S., TikTok was initially known as Musical.ly, an app where users uploaded lip-synching

videos. In 2016, the Chinese technology company, ByteDance, launched a version of Musical.ly for the Chinese market, entitled Douyin. ByteDance then purchased Musical.ly and incorporated it into Douyin, launching it for the non-Chinese international market, including the U.S., becoming the current version of TikTok.

17.     One month after its debut, in September 2018, TikTok surpassed Facebook, Instagram, YouTube, and Snapchat in monthly installations, with more than one billion downloads. Users enjoy viewing and creating dancing, lip-synching videos, comedy skits (sometimes called "memes"), and "challenges" where users upload videos performing the same dance or task as others, often giving their own unique spin on the task. But the variety of information and types of content that can be created are limitless—if you can imagine it, it likely exists on TikTok.

18.     This content is offered in endlessly consumable, dopamine-boosting mini "bites," as videos are typically less than one minute long. Much like a slot machine at a casino, users can find themselves scrolling TikTok for hours without realizing it, awash in the dopamine rush. The use of TikTok exploded in 2020 during lockdown periods throughout the first year of the COVID-19 pandemic. It was the second most popular iPhone app downloaded in 2020 and the most popular in the U.S. in 2021. TikTok's immense success as a social media platform has allowed it to quickly join the ranks of other social media giants like Twitter, Snapchat, Reddit, Facebook, and Instagram.

19.     In 2021, TikTok generated an estimated $4.6 billion in revenue, with 1.2 billion people actively using the app in the last quarter of 2021.

20.     The U.S. is TikTok's largest market outside of China. As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users.

1

2

**A.     TikTok's Business Model: Profits from Advertising by Monetizing User Data**

3      21.     Despite being a free social media app, TikTok amasses billions in revenue.

4    It relies on selling digital advertising inside the application as its primary income source.

5    TikTok's U.S. ad revenue is slated to grow by 184% this year. Of the $250 billion that

6    companies spend on digital marketing, TikTok will accumulate 2.4%—more than what

7    Snapchat and Twitter (combined) will receive.

8      22.     TikTok touts that 1 in 2 Generation Z ("Gen Z") TikTok users are likely

9    to buy something while using the app and that 81% of users use TikTok to discover new

10   products and brands. In the second quarter of 2021, consumers spent over $500 million

11   via the app.

12     23.     The metrics concerning the number of people who make purchases while

13   using TikTok and/or learn about new products and brands is significant, given

14   information that has come to light about TikTok's undisclosed data collection

15   practices.

16     24.     In 2020, TikTok for Business was launched, allowing businesses to

17   purchase ad space on TikTok and create a label specifying whom they want to target.

18   Users can click on the link in these ads to purchase the advertised product.

19     25.     Tracking information about a user's interests and habits are critical

20   components of its advertising business model because it is precisely this kind of

21   information that allows TikTok to sell advertising to its customers as effective and

22   targeted to specific audiences.

23     26.     TikTok offers several different types of ad categories that a business can

24   purchase: Top-View Ads, which display the company's content while a user is engaging

25   with the app; Brand Takeover Ads, which display immediately when the app is opened;

26   Branded Effects, where a company purchases custom filters, stickers, and lenses used

27   virtually to create content on the app; and Hashtag Challenges, where a company

28

creates its own challenge and assigned hashtag, and then pays TikTok to make it appear on users' feeds.

**B.   Global Privacy Concerns Regarding TikTok's Data Use Practices**

27.   Despite its popularity, after TikTok's release in 2018, many privacy concerns regarding the app emerged and several countries have launched investigations amid concerns regarding TikTok's handling of users' personal data. Indeed, TikTok has settled litigation over several different aspects of its data privacy.

**1.   Concerns in the U.S.**

28.   In February 2019, following its investigation, the U.S. Federal Trade Commission ("FTC") entered into a consent decree with TikTok Inc. and TikTok Ltd., fining them $5.7 million for collecting information from minors under the age of 13 in violation of the Children's Online Privacy Protection Act ("COPPA"), despite TikTok's claims that users under age were not allowed on the app.

29.   U.S. Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence in October 2019 explaining the national security concerns over the possibility that TikTok may share personally identifiable user information and private content with the Chinese government, stating, "[w]ith over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore. Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok . . . and brief Congress on these findings."[4]

30.   In July 2020, the FTC and the U.S. Department of Justice ("DOJ") again initiated investigations after a complaint was filed alleging that TikTok violated the

---

[4]  Press Release, Senators Tom Cotton and Chuck Schumer, (Oct. 14, 2019), https://www.cotton.senate.gov/news/press-releases/cotton-schumer-request-assessment-of-national-security-risks-posed-by-china-owned-video-sharing-platform-tiktok-a-potential-counterintelligence-threat-with-over-110-million-downloads-in-us-alone.

terms of the consent decree. Again, this garnered Congressional attention regarding TikTok's data practices.

31.    Congress and the DOJ subsequently raised concerns in September 2020 that TikTok's parent company, ByteDance, has a close relationship with the Chinese government, putting the data that TikTok accumulates on U.S. users at risk of being transferred to the Chinese government. Even without a cozy relationship, ByteDance is subject to laws that would require it to transfer data at the behest of the Chinese government.

32.    In 2020, then-U.S. President Donald Trump viewed TikTok as a serious national security threat and proposed a ban on the app, ultimately issuing an executive order to that effect, because TikTok's "data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information— potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."[5]

33.    CNBC reported that ByteDance has access to U.S. user data and that former TikTok employees expressed concern regarding the parent company's level of involvement in TikTok's operations.

34.    Cybersecurity experts say such ease of access exposes U.S. information to acquisition by the Chinese government.

35.    A BuzzFeed News report in June 2022 confirmed the same—that despite years of TikTok's assertions to the contrary, ByteDance does hold, and has accessed, nonpublic data regarding U.S. TikTok users. U.S.-based TikTok employees did not have permission or knowledge of how to access the U.S. data. A 2022 Internet 2.0 analysis on TikTok security found that the iOS application of TikTok connects directly to mainland China.

---

[5] Exec. Order No. 13942, 85 Fed. Reg. 48637 (Aug. 6, 2020).

36. Buzzfeed News's report prompted several Republican U.S. Senators to send a letter to TikTok Chief Executive Officer Shou Zi Chew, concerned that "TikTok's representative did not provide truthful or forthright answers to the Senate Commerce Committee . . . [and] is now taking steps to deflect from its knowing misrepresentations by changing how "protected" data can be accessed by its employees."[6]

37. Indeed, in September 2022, in testimony before the Senate Homeland Security Committee, TikTok Chief Operating Officer Vanessa Pappas confirmed that TikTok would not commit to cutting off China's access to U.S. user data. China's control over the app has only expanded as the Chinese government has recently acquired a 1% stake in the Beijing parent of ByteDance and a seat on its board.

38. Shortly after Pappas's testimony, Senator Josh Hawley sent a letter to Treasury Secretary Janet Yellen, the chair of the Committee on Foreign Investment in the United States ("CFIUS"), with a copy to the FTC Chair Lina Khan, urging CFIUS to require TikTok to sever all ties from ByteDance and any other Chinese companies, and urging the FTC to investigate TikTok for "unfair or deceptive acts or practices."

39. Concerns over the app's privacy policies have also gathered the attention of several U.S. states' attorneys general. Texas and Montana have launched investigations in 2022, and California Attorney General Robert Bonta also announced a bipartisan investigation in concert with Florida, Kentucky, Nebraska, Tennessee, Massachusetts, New Jersey, Vermont, and yet-to-be disclosed attorney general offices from other states.

40. TikTok is banned by the U.S. Army, Navy, Air Force, Coast Guard, Marine Corps., Department of Defense, Department of Homeland Security, and TSA, and cannot be installed on government-issued phones. President Biden's campaign also

---

[6] Letter from Senator Marsha Blackburn to Mr. Shou Zi Chew (June 27, 2022), https://www.blackburn.senate.gov/2022/6/blackburn-leads-letter-demanding-answers-on-tiktok-s-backdoor-data-access-for-beijing.

1  urged its staff to remove the app from their work and personal devices. Wells Fargo has

2  forbidden its employees from installing the app on company mobile devices.

3      41.    The Federal Communications Commission ("FCC") Commissioner

4  Brendan Carr has been increasingly vocal in his call for a ban of TikTok since writing

5  to the CEOs of Apple and Google to remove the app from their app stores in June 2022,

6  citing privacy concerns. In referring to negotiations between TikTok and CFIUS on

7  what data should be protected, he lamented, "I have a very, very difficult time looking

8  at TikTok's conduct thinking we're going to cut a technical construct that they're not

9  going to find a way around." Federal Bureau of Investigation Director Christopher

10  Wray told House Homeland Security Committee members that he is "extremely

11  concerned" about TikTok's operations.

12      42.    TikTok's unscrupulous data practices are a bipartisan concern. Senator

13  Mark Warner, Chairman of the Senate Intelligence Committee, issued a warning during

14  a Fox News Sunday appearance on November 20, 2022, that "TikTok is an enormous

15  threat." Senator Warner continued by questioning "the idea that we can somehow

16  separate out TikTok from the fact that the actual engineers [are] writing the code in

17  Beijing." He also stated that TikTok is "a massive collector of information . . . [and]

18  can visualize even down to your keystrokes . . . all of that data . . . is being stored

19  somewhere in Beijing." He ended by reminding viewers that U.S. data would be turned

20  over to the Chinese government, should it so request: "TikTok, at the end of the day,

21  has to be reliant on the Communist Party, the China law states that."[7]

22      43.    Senator Warner and Senator Marco Rubio sent a bipartisan letter to the

23  FTC earlier this year requesting that the commission investigate TikTok once again.

24  The letter calls out TikTok's "repeated misrepresentations . . . concerning its data

25

26

27

[7]   *Fox   News   Sunday*   (Nov.   20,   2022),   https://www.foxnews.com/video/
28  6315965293112.

9

security, data processing, and corporate governance practices," including those made under oath during a Congressional committee hearing in October 2021.[8]

### 2.    Concerns Abroad

44.    TikTok has been called a "hunting ground" for child predators by digital privacy watchdogs. In 2019, following the FTC's fine for COPPA violations, the United Kingdom's Information Commissioner's Office launched its own investigation on how the app handles the data of young users, including how private data is collected and concerns that TikTok's messaging system allowed minors to receive direct messages from adult users via the app's messaging system.

45.    In June 2020, the European Data Protection Board announced it was assembling a task force to examine TikTok's privacy and security practices.

46.    In 2021, the Dutch Authority levied a €750,000 fine against TikTok following its investigation into TikTok's privacy practices relating to children. After the Dutch investigation, TikTok changed its settings to ensure better parental controls over children's use of the app.

47.    In September 2021, after TikTok's move to relocate its European regional headquarters to Ireland, the Ireland Data Protection Commission began its investigation into TikTok into whether TikTok sufficiently protects the personal data of legal minors, the extent of the app's age-verification measures for children under thirteen years of age, and the app's transfer of personal data to countries outside the EU—including to China, the home to parent company ByteDance.

48.    In July 2022, Italian data protection experts warned that under a TikTok privacy policy update affecting the European Economic Area, the U.K., and Switzerland, the app would stop asking users for permission to be tracked for targeted ads.

---

[8] Letter from Senators Marco Rubio and Mark Warner to FTC (July 6, 2022), https://www.rubio.senate.gov/public/index.cfm/2022/7/english-espa-ol-rubio-warner-call-for-investigation-into-tiktok-after-chinese-communist-party-s-access-to-u-s-data-comes-to-light.

49.   The U.K. Information Commissioner's Office recently issued a notice that TikTok "processed special category data without legal grounds to do so," "processed children's data without parental consent," and failed to provide information regarding its app to users in a "transparent and easily understood way." Special category data includes "ethnic and racial origin, political opinions, religious beliefs, sexual orientation, trade union membership, genetic and biometric data or health data."

### 3.   Biometric Data Privacy Litigation

50.   In December 2020, Defendants were sued for their alleged violation of the Illinois Biometric Information Privacy Act ("BIPA"), a state statute that prohibits a private company from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or information without first obtaining the necessary approvals from the biometrics' owner.

51.   TikTok settled the BIPA for $92 million. However, the BIPA litigation did not concern information collected through TikTok's in-app browser.

### C.   TikTok's Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third-Party Websites

52.   As alleged above, part of TikTok's business model is to attract businesses to advertise on its platform. To drive business, TikTok touts that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok, that 81% of users use TikTok to discover new products and brands, and that TikTok video ads take up 6 times more screen space than banners.

53.   To drive its business, TikTok presents users with links to third-party websites in multiple ways.

54.   One way in which TikTok presents users with third-party websites is through TikTok video ads.

55.   Video ads typically load onto a user's feed and appear as a normal TikTok video except that they contain icons identifying them as sponsored posts or ads. Indeed, ad-identifying links open third-party websites. As a video plays, another box appears,

suggesting that the user click the link to view the product. This box also opens a third-party website. After the video ad concludes, users are given another opportunity to click a link that opens a third-party website.

56.     Normally, an individual accesses a website using their default internet browser, such as Safari or Google Chrome, but that process can be modified when accessing websites using apps on a computer or mobile device. In each of the foregoing examples, the third-party website is opened on TikTok's in-app browser.

57.     When a user attempts to access a website in the TikTok app by clicking a link, the website does not open via its default browser. Instead, unbeknownst to the user, the link is opened inside Defendants' in-app browser. Thus, the user views the third-party website without leaving the TikTok app. As described below, this in-app browser usage makes TikTok privy to any confidential information that the user inputs on this third-party website, without the user knowing.

58.     TikTok also presents its users with links to third-party websites through profile links, available for users with large followings. A TikTok user with more than 1,000 followers can add a link to external websites in their profile to market their products or bring users to websites outside the application. Popular TikTok personalities, businesses, and organizations routinely place such links in these public profiles allowing access to storefronts or registration pages.

59.     When users click on a link in a profile, they are directed to an external website. Undisclosed by Defendants is that users are accessing the external website on TikTok's in-app browser.

60.     When these links are clicked, there is no option to open the website via any browser other than TikTok's in-app browser.

61.     TikTok's in-app browser is not benign for two reasons. First, the in-app browser inserts JavaScript code into the third-party websites that are accessed using the in-app browser. These websites are unaware of and do not consent to the automatic insertions. The inserted code surreptitiously intercepts all of the TikTok user's usage of

the in-app browser while it is open, and TikTok tracks and captures all these details simultaneously with the user's activities. The operators of these websites did not consent to the interception of the details of visitors' activities on their site.

62.    Second, as described above, consumers spent over $500 million via the TikTok app in just the second quarter of 2021. The transactions included in the $500 million occurred on TikTok's in-app browser.

63.    While a user interacts with a third-party website via the TikTok app, TikTok records all keyboard inputs—the equivalent of installing a keylogger. TikTok also records every tap on any button, link, image, or other website element and logs details about what that element is. Such minute recording would allow for a complete replication of the user's interaction with the third-party website.

64.    Security and privacy researcher Felix Krause created and used a tool, called InAppBrowser.com, to detect JavaScript commands executed by apps.[9] Krause concluded, "TikTok injects code into third party websites through their in-app browsers that behaves like a keylogger." Anything that a user does via TikTok's in-app browser is recorded and copied by Defendants—what links were clicked, what form fields were filled out, how long a user hovered over a particular set of text, what images were viewed, and any text written. This gives rise to serious data protection concerns.

65.    Krause published his findings online including, *inter alia*, the specific code he uncovered and a description of its functions:

---

[9] Felix Krause, *iOS Privacy: Announcing InAppBrowser.com - See what Javascript Commands Get Executed In An In App Browser*, KRAUSEFX (Aug. 18, 2022), https://krausefx.com/blog/announcing-inappbrowsercom-see-what-javascript-commands-get-executed-in-an-in-app-browser.

1

2

3

4

5



6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Felix Krause,

21  https://krausefx.com/assets/posts/inappbrowser/app_screenshots/tiktok.png.

22      66.    The preceding graphic shows the specific JavaScript code inserted by

23  Defendants' in-app browser into the Apple iOS and Krause's analysis of that code,

24  along with his tool's description of the function of the code. On information and belief,

25  Defendants' in-app browser also inserts similar JavaScript coding into the Android

26  operating system.

27      67.    As alleged above, when a user accesses an external website through

28  TikTok's in-app browser, TikTok tracks every single detail of the user's interaction

with the website. For online purchase transactions, this would include all of the details of the purchase, the name of the purchaser, their address, telephone number, credit card or bank information, usernames, passwords, dates of birth, as well as the purchase price, perhaps leading to TikTok's oft-touted user purchase metrics.

68.     The in-app browser does not just track purchase information. It tracks everything—meaning that Defendants likely obtain detailed private and sensitive information about users' physical and mental health as well.

69.     For example, several health providers and pharmacies have a digital presence on TikTok, with videos that appear on users' feeds. One such provider, Planned Parenthood, whose account is verified by the app, offers a link to its website.

70.     The user can then click the "learn" link on the Planned Parenthood website, directing it to various resources with options to click and read under several topics, including abortion; birth control; cancer; emergency contraception; pregnancy; sex, pleasure, and sexual dysfunction; sexual orientation; and gender identity. Knowing what page the user reads can reveal deeply personal and private information. For example, as shown below, a user may be trying to learn about their sexual orientation. A user may feel assured by Planned Parenthood's promise that others will only know sexual orientation if that user chooses to so communicate, not realizing TikTok has already intercepted this valuable information, ready to deploy and monetize it to send targeted content and advertisements to the user.

71.     TikTok will also intercept a user's searches for health and mental health care, including abortion services, if a user clicks the "Get Care" link. To use Planned Parenthood "Abortion Clinics Near You" finder feature, a user inputs sensitive and private information, such as age, location, and the first day of the user's last period. The user is assured that "your information is private and anonymous," even though— unbeknownst to Planned Parenthood or the user—TikTok is actively intercepting it.

72.     TikTok's acquisition of this sensitive information is especially concerning given the Supreme Court's recent reversal of *Roe v. Wade* and the subsequent

criminalization of abortion in several states. Right after the precedent-overturning decision was issued, anxieties arose over data privacy in the context of common period and ovulation tracking apps.

73.     In the aftermath of *Roe*'s reversal, Sara Morrison, reporting for *Vox*, noted the lucrative nature of a business knowing when someone gets pregnant—so they can be targeted with baby-related ads.

74.     Perhaps a user is looking into pregnancy care. A simple search of "prenatal care" tells TikTok that this user may be pregnant. TikTok might know the user is pregnant even before the user's close family and friends.

75.     Users also have the option to donate to Planned Parenthood on its website. To do so, a user inputs either PayPal credentials, bank account and routing numbers, or credit card number and expiration date. Name, address, email, and phone number are also captured during the payment process. Using its keystroke capturing code, TikTok intercepts and records these inputs.

76.     BetterHelp, a mental health service provider, also has a presence on TikTok. Like Planned Parenthood, BetterHelp's profile page includes a link to its website.

77.     This link takes a user to BetterHelp's survey that matches the user with a therapist. The questions asked in this survey are sensitive and private, revealing a user's sexual orientation, religion, age, relationship status, location, financial status, and more.

78.     Similarly, during election season it is normal for users to be bombarded with political ads soliciting donations and voter registration campaigns via TikTok, all with links to third-party websites which TikTok can monitor, obtaining sensitive user data.

79.     The above examples are just some of the thousands of third-party websites where users input private, personally identifying, and sensitive data. But all of the examples described in the foregoing paragraphs constitute instances where users could,

16

and did, transact business via a third-party website without knowing that they were using TikTok's in-app browser, which was simultaneously intercepting, recording, and using Plaintiff's and Class Members' digital information—none of which Plaintiff or the Class Members consented to.

**D.  The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiff and Class Members**

80.  Defendants built their business around the collection of personal data because the "world's most valuable resource is no longer oil, but data." As *The Economist* analogized, a user's personal data is the "oil field of the digital era."[10]

81.  It is common knowledge in the industry that there is an economic market for consumers' personal data—including the data that Defendants collected from Plaintiff and Class Members.

82.  In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name." That same article noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[11]

83.  The Organization for Economic Cooperation and Development ("OECD") published a 2013 paper titled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value." In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses." OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an

---

[10] *The World's Most Valuable Resource Is No Longer Oil, But Data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[11] Pauline Glikman, Nicolas Glady, *What's The Value of Your Data?* (Oct. 13, 2015 7:00 PM), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

1
2
3
4

address, USD 2 [i.e., $2.00] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military record is estimated to cost USD 55."[12]

5
6
7

84.    Furthermore, individuals can sell or monetize their own data if they choose. Indeed, Defendants themselves have valued individuals' personal data in real-world dollars.

8
9
10

85.    As an example, Meta has offered to pay individuals for their voice recordings, and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones.

11
12

86.    Many other companies and apps, such as Nielsen Data, Killi, DataCoup, and AppOptix, offer consumers money in exchange for their personal data.

13
14
15
16

87.    Given the monetary value that data companies have already paid for personal information in the past, Defendants have deprived Plaintiff and the Class Members of the economic value of their data without providing proper consideration for their property.

17
18

**E.    Plaintiff and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser**

19
20

88.    Plaintiff and Class Members have a reasonable expectation of privacy in the data Defendants collected through the in-app browser.

21
22
23

89.    Several studies examining the collection and disclosure of personal data have concluded that such collection violates privacy expectations established as general social norms.

24
25
26
27
28

---

[12] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, 220 OECD Digital Economy Papers (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf?expires=16729418 90&id=id&accname=guest&checksum=F922465F2544DE67018DEEBD71CF806C

90.     Privacy polls and studies are nearly uniform in showing that nearly all Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before data is collected and shared.

91.     For example, a recent study by Consumer Reports confirmed Americans' shrinking confidence that their "online information is private and secure."[13] Consumers across political party lines—92% of Americans—confirmed their belief that internet companies and websites should need to obtain consent before selling or sharing their data with other companies. The same percentage believe internet companies and websites should have to provide consumers with a complete list of the data collected about them.

92.     According to a study by Pew Research Center, most Americans—roughly six in ten U.S. adults—say that they do not think it is possible to go through daily life without having data collected about them by companies. Yet holding this belief has not eroded people's expectation that their data remain private. Approximately 79% of Americans report being concerned about the way companies are using their data.[14]

93.     When given a choice, users have shown that they will act consistently with their concerns and in favor of their expectation of privacy. Following the roll-out of the new iPhone operating software—which required clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

94.     Defendants surreptitiously collected and used Plaintiff's and Class Members' data in violation of Plaintiff's and Class Members' reasonable expectations of privacy.

---

[13] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

[14] Brooke Auxier, et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Plaintiff and Class Members Did Not Consent to the Collection of Data via TikTok's In-App Browser**

95.      The idea that consumers are given notice about how companies collect and use data, and ask for their consent to having their data used that way, lies at the heart of the current data collection and privacy protection policy. However, 97% of U.S. adults said that they were asked to approve privacy policies, yet only one-in-five adults overall say they always (9%) or often (13%) read these policies. Approximately 38% of U.S. adults maintain that they sometimes read such policies, and 36% say they never read a company's privacy policy before agreeing to it.[15]

96.      Along with the concerns cited above about how companies handle personal data, a majority of Americans (57%) say they are not too confident (40%) or not at all confident (17%) that companies follow what their privacy policies say they will do with users' personal data.

97.      Against that backdrop, Plaintiff and Class Members did not knowingly consent to Defendants' collection of their data through the in-app browser.

98.      Nowhere in Defendants' Terms of Service, or the privacy policies, did Defendants disclose that TikTok compels its users to use an in-app browser that inserts JavaScipt code into the external websites that users visit from the TikTok app, which then provides TikTok with a complete record of every keystroke, every tap on any button, link, image or other component on any website, and details about the elements the users clicked.

99.      Without disclosing the collection of this kind of data through the JavaScipt insertions via TikTok's in-app browser, Defendants cannot have secured consent for the sharing and/or use of this kind of data.

---

[15] Auxier, *supra* note 14.

1

## V.    TOLLING

2       100.   Plaintiff re-alleges and incorporates by reference all preceding allegations

3   as though fully set forth herein.

4       101.   The statutes of limitations applicable to Plaintiff's claims were tolled by

5   Defendants' conduct and Plaintiff's and Class Members' delayed discovery of their

6   claims.

7       102.   As alleged above, Plaintiff did not know, and could not have known, when

8   he downloaded and used TikTok that the app directed users to third-party websites

9   through the in-app browser and that the in-app browser intercepted all of Plaintiff's

10  activities and communications on third-party websites viewed in the in-app browser

11  using JavaScript insertions that track every keystroke, tap, click, like, etc., and the

12  details of his interaction with any third- party website through the in-app browser.

13      103.   Plaintiff did not have the means to discover Defendants' allegedly unlawful

14  conduct until the information was made public by Mr. Krause's research.

15      104.   Plaintiff could not have discovered, through the exercise of reasonable

16  diligence, the full scope of Defendants' alleged unlawful conduct. Defendants

17  seamlessly incorporated their proprietary, in-app browser and the JavaScript insertions

18  that tracked Plaintiff's activities, into the TikTok app. Simultaneously, Defendants

19  failed to disclose that the in-app browser modifies the source code of websites that

20  users visit using the in-app browser to copy every keystroke, and/or interaction with

21  the website, and the content of those interactions.

22      105.   All applicable statutes of limitations have been tolled under the delayed

23  discovery rule. Under the circumstances, Defendants were under a duty to disclose the

24  nature and significance of their data collection practices but did not do so. Defendants

25  are therefore estopped from relying on any statute of limitations.

26  ## VI.    CLASS ACTION ALLEGATIONS

27      106.   Plaintiff brings this action under Rule 23, individually and on behalf of the

28  following classes (collectively, the "Classes"):

21

**Nationwide Class**: All natural persons in the United States who used the TikTok app to visit websites external to the app, via the TikTok's in-app browser (the "Nationwide Class");

**Washington Subclass**: All natural persons residing in the State of Washington who used the TikTok app to visit websites external to the app, via TikTok's in-app browser (the "Washington Sub-Class").

107.   Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

108.   **Numerosity**: The exact number of class members is unknown and unavailable to Plaintiff, but individual joinder is impracticable. As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users.

109.   **Predominant Common Questions**: The Classes' claims present common questions of law and fact, which predominate over any questions that may affect individual Class Members. Common questions for the Classes include, but are not limited to, the following:

a.   Whether Defendants violated the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*.;

b.   Whether Defendants violated the Washington Wiretapping Statute, Wash. Rev. Code § 9.73.030, *et. seq*.;

c.   Whether Defendants violated common law privacy rights;

d.   Whether Plaintiff and the Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

e.   Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

110.   **Typicality**: Plaintiff's claims are typical of the claims of other Class members. The claims of Plaintiff and the Class Members arise from Defendants' conduct and are based on the same legal theories.

111.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to the interests of the Class, and Defendants have no defense unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the Class.

112.   **Substantial Benefits**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and the joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

113.   **Notice**: The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, inter alia, email, publication in major newspapers, and/or on the internet.

114.   Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE FEDERAL WIRETAP ACT

### 18 U.S.C. §§ 2510, *et seq*.

### (On behalf of the Nationwide Class and the Washington Sub-Class)

115.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated here.

116.   The Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

117.   "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

118.   "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

119.   "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

120.   "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" 18 U.S.C. § 2510(12).

121.   Defendants are each a "person" for purposes of the Wiretap Act because they are corporations.

122.   The JavaScript inserted by TikTok—that copies every keystroke, every tap on any button, link, image, or other component and the details about the elements users

clicked on—constitutes a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because they are electronic means of acquiring the contents of users' wire, electronic, or oral communications via Defendants in-app browser.

123.   Plaintiff's and Class Members' sensitive personal information, data, and interactions with the websites that Defendants intercepted through their in-app browser are "electronic communication[s]" under 18 U.S.C. § 2510(12).

124.   Plaintiff and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.

125.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies.

126.   Interception of Plaintiff's and Class Members' electronic communications without their consent occurred whenever a user clicked on a link to a website external to TikTok. Defendants were not parties to those communications, which occurred between Plaintiff and Class Members and the websites they sought to access or accessed. Defendants used Plaintiff's and Class Members' electronic communications as part of their advertising and marketing business model.

127.   Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products. Moreover, experts who uncovered the JavaScript injections in Defendants' in-app browser explained that the inclusion of the JavaScript injections were intentional, non-trivial, engineering tasks— the kind that does not happen by mistake or randomly.

128.   Neither Plaintiff nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The websites that Plaintiff and Class Members visited did not know of or consent to Defendants' interception of the details about visitors' access to and activities on their websites. Nor

could they—Defendants never sought to obtain, nor did it obtain, Plaintiff's, Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

129.   Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE WASHINGTON WIRETAPPING STATUTE

### Wash. Rev. Code § 9.73.030, *et seq*.

### (On behalf of the Washington Sub-Class)

130.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

131.   The Washington Wiretapping Statue (the "WWS") prohibits the interception or recording any "[p]rivate communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication[.]" Wash. Rev. Code § 9.73.030(1)(a).

132.   The WWS further states that "[a]ny person who, directly or by means of a detective agency or any other agent, violates the provisions of this chapter shall be subject to legal action for damages, to be brought by any other person claiming that a violation of this statute has injured his or her business, his or her person, or his or her

reputation. A person so injured shall be entitled to actual damages, including mental pain and suffering endured by him or her on account of violation of the provisions of this chapter, or liquidated damages computed at the rate of one hundred dollars a day for each day of violation, not to exceed one thousand dollars, and a reasonable attorney's fee and other costs of litigation." Wash. Rev. Code § 9.73.060.

133.   Defendants are each a "person" for purposes of the WWS because they are corporations.

134.   The JavaScript inserted by TikTok in its in-app browser—that copies every keystroke, every tap on any button, link, image, or other component and the details about the elements users clicked on—constitutes a "device" that is "designed to record and/or transmit" communication because within the meaning of the WWS. Wash. Rev. Code § 9.73.030(1)(a).

135.   Plaintiff's and Class Members' intercepted Website Communications constitute "private communications" within the meaning of the WWS. Wash. Rev. Code § 9.73.030(1)(a).

136.   Defendants intentionally procure and embed JavaScript on TikTok's in-app browser to spy on, automatically and secretly, and to intercept TikTok users' electronic interactions.

137.   Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

138.   Plaintiff and Class Members did not consent to having their activity and communications within TikTok's in-app browser wiretapped.

139.   Pursuant to Wash. Rev. Code § 9.73.060, Plaintiff and the Class members seek (1) actual damages, not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, not to exceed one thousand dollars, and (2) reasonable attorneys' fees and other costs of litigation incurred.

140.   Defendants' conduct is ongoing, and they continue to unlawfully intercept the communications of Plaintiff and Class Members any time they use TikTok's in-app

27

browser without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications and to require TikTok to obtain consent prior to intercepting users' interactions and communications third-party websites via TikTok's in-app browser.

<strong>THIRD CLAIM FOR RELIEF</strong>

<strong>Violation of Common Law Invasion of Privacy—Intrusion Upon Seclusion</strong>

<strong>(On behalf of the Nationwide Class and the Washington Sub-Class)</strong>

141. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

142. Plaintiff asserts claims for intrusion upon seclusion and so must plead (1) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiff and Class Members had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

143. Defendants' in-app browser inserts JavaScript instructions into any website that is visited using the in-app browser. These JavaScript instructions record every keystroke, which could include names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information which is typed into the in-app browser. The JavaScript instructions also record every tap on any button, link, image, or other component of a website. This provides Defendants with very detailed information about the kinds of things that each user of the in-app browser is tapping or "clicking" on. As one example, Planned Parenthood maintains a TikTok presence, and its member profile links to Planned Parenthood's external website. Clicking on that link from inside Defendants' in-app browser would supply Defendants with an exact record of every link or button that is tapped while viewing that site from within the in-app browser. Finally, the JavaScript instructions in Defendants' in-app browser provide Defendants with details about the

elements users clicked on—providing them with additional information about the content that is being viewed or clicked on during use of the in-app browser.

144.   Defendants' copying of all these kinds of data using the undisclosed JavaScript tracking insertions constitutes an intentional intrusion upon Plaintiff and Class Members' solitude or seclusion in that Defendants collected these kinds of sensitive pieces of information that were intended to stay private from third parties without users' consent.

145.   Plaintiff and Class Members had a reasonable expectation of privacy in their data. Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

146.   Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that their data would be collected or used by Defendants.

147.   Defendants' intentional intrusion on Plaintiff's and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their data would not be collected or used.

148.   The surreptitious taking and disclosure of data from millions of individual TikTok users was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

149.   Given the nature of the data Defendants collected and disclosed including, but not limited to: names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search

terms, doctor's names, spouses names, children's names, or any other information which is typed into the in-app browser, every tap on any button, link, image or other component of a website, and details about the contents of what users clicked and/or viewed—this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

150.   As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

151.   Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

152.   Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiff's and Class Members' privacy.

153.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

154.   Plaintiff also seeks such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(On behalf of the Nationwide Class and the Washington Sub-Class)**

155.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

156.   Defendants received benefits from Plaintiff and Class Members in the form of data which has substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiff and Class Members.

157.   Plaintiff and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiff and Class Members, without authorization and proper compensation. Defendants collected and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

158.   Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

159.   The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in California, and every other state, for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

160.   Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## VIII. PRAYER FOR RELIEF

161. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

    a.    An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, designating the undersigned as Class Counsel, and making such further orders to protect Class members as the Court deems appropriate;

    b.    An order enjoining Defendants to desist from further deceptive business practices with respect to the in-app browser and such other injunctive relief that the Court deems just and proper;

    c.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

    d.    An award for Plaintiff and Class Members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

    e.    All remedies available under the Federal Wiretap Act, including, but not limited to, damages whichever is greater of (A) actual damages suffered by Plaintiff and Class Members and any profits made as a result of the violations; or (B) statutory damages of whichever is greater of $100 a day for each day of violation or $10,000;

    f.    All remedies available under the Washington Wiretapping Statute, including but not limited to (A) actual damages, not less than liquidated damages computed at the rate of $100 a day for each day of violation, not to exceed $1,000, and (B) reasonable attorneys' fees and other costs of litigation incurred.

g.     Any applicable statutory and civil penalties;

h.     An award of costs and attorneys' fees, as allowed by law;

i.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

j.     Leave to amend this Complaint to conform to the evidence produced at trial; and

k.     Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: January 9, 2023                    Respectfully submitted,

**KESSLER TOPAZ**
**  MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Plaintiff Yevgeniy S. Androshchuk and the Proposed Classes*